# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 13, 2010 Session

## STATE OF TENNESSEE v. JAMES ANTHONY BURGESS

**Appeal from the Criminal Court for Putnam County**
**No. 07-0676   David A. Patterson, Judge**

---

**No. M2009-00897-CCA-R3-CD - Filed August 4, 2010**

---

Appellant, James Anthony Burgess, was indicted by the Putnam County Grand Jury for two counts of first degree murder, two counts of felony murder, one count of especially aggravated burglary, and one count of reckless endangerment. These indictments came as a result of the shooting deaths of Appellant's estranged wife and her boyfriend at her home. A jury convicted Appellant of two counts of second degree murder, two counts of felony murder, one count of especially aggravated burglary, and one count of reckless endangerment. The jury determined that Appellant should be sentenced to life in prison for each felony murder conviction. Appellant's total effective sentence was two consecutive life sentences. We remand this case for the trial court's modification of Appellant's sentence for especially aggravated burglary to aggravated burglary. In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed and Modified.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Samuel J. Harris, Cookeville, Tennessee, for the appellant, James Anthony Burgess.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Bill Gibson, District Attorney General, and Anthony Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

Appellant and the victim, Elizabeth Burgess, began dating in 1998. At the time, the victim was already pregnant with her first child, M.C. Appellant was with the victim when M.C. was born, and Appellant took an active role in raising the child. On June 30, 2000, Appellant and the victim got married. On December 17, 2002, J.B., the son of the victim and Appellant, was born. Shortly after the birth of J.B., the marriage began to deteriorate.

By January 2007, the marriage was beyond repair. According to Appellant, the victim told him at that time that she was unhappy with him and unhappy in the marriage. Appellant began sleeping at the ambulance station where he worked as a paramedic. By March 2007, he was living at a friend's house. During this time period, Appellant began dating a woman named Jackie Reid, and the victim began dating a man named Jimmy Prewitt, the other victim.

On February 22, 2007, the chancery court entered an order which ordered Appellant to have no contact with the victim. Appellant testified that he was not present when the court ruled on the order of protection. He admitted that he signed it at a later time. On March 26, 2007, the chancery court entered an ex parte order of protection in which Appellant was ordered to have no contact or communication with the victim. The order also set a hearing for April 5, 2007. On April 5, 2007, the court entered an order continuing the matter until a hearing on April 20, 2007, and extending the ex parte order of protection.

Appellant had visitation with J.B. on May 1 and May 3, 2007. On May 5, 2007, according to Appellant, the victim sent him a text message that she needed child support money. On the evening of May 5, 2007, Appellant sent the victim several text messages to try to get her to talk to him about J.B. and whether Mr. Prewitt was spending the night at the house. The victim sent a reply that she was eating supper and refused to talk to Appellant at that time. She told him to send her a text message or leave a voice mail instead. Appellant found the victim, Mr. Prewitt, and the children, M.C. and J.B., at Cheddar's restaurant. Appellant approached them in the parking lot. Words were exchanged between Appellant, the victim, and Mr. Prewitt. The victim drove off with Mr. Prewitt and the children. Appellant was angry and sat in his car.

Shortly thereafter, Appellant began driving to the victim's home which he formerly shared with her. As he drove to the house, he called Ms. Reid and told her that he could not "take this anymore," and he was going to "kill her," meaning the victim. Ms. Reid testified that he might have said "kill them" instead of "kill her." When Appellant arrived at the house, the victim and Mr. Prewitt were outside on the front porch. The victim said that she did not want to talk to him and the victim and Mr. Prewitt went inside the house. Appellant walked to his car and pulled out a gun from his duffle bag. According to Appellant, he was attending a picnic later that day and intended to do some target practice with a friend. Appellant loaded two magazines with ammunition. He placed one magazine in the gun. Appellant walked to the front door. He could see M.C. and J.B. in M.C.'s room through the window which is right next to the front door. Appellant knocked on the door. When the victim and Mr. Prewitt did not open the door, Appellant fired into the front door six times. Using the gun, he broke a side window next to the door. Appellant reached through the broken window and unlocked the door. Appellant walked into the living room and shot the victim nine times.

Appellant followed Mr. Prewitt into M.C.'s room. The children were standing in front of the raised window. Appellant had told them long ago to crawl out of the window and get out of the house when the alarm was set off. Mr. Prewitt ran to the window with the children and pushed the children behind him. Appellant entered the room about where the children were standing and began shooting Mr. Prewitt. Mr. Prewitt climbed out of the window, and Appellant followed him. Mr. Prewitt was shot five times and one of the wounds was at his left temple. The shot to Mr. Prewitt's temple had been fired from two and a half to three feet away.

According to Appellant, after shooting the victim and Mr. Prewitt, his first thoughts were of the children. He went inside the house to make sure they were okay. He hugged and kissed them. He went to the living room and saw the victim's body. He knew that she was dead. He held her hand and told her that he loved her. Appellant disconnected the house alarm and called 911. He told the operator that he had killed the victim because he hated her and she hated him. When the 911 operator asked if the victim was dead, Appellant replied that he hoped so.

Appellant sat on the front porch of the house and considered committing suicide. However, a friend called his cellphone and talked Appellant out of it. While Appellant sat on the front porch, local law enforcement surrounded the house and set up a perimeter with a SWAT team. Local law enforcement had been informed that Appellant was armed by the 911 operator. After about three hours, the officers were able to approach Appellant and arrest him. The children were in the house until Appellant was arrested.

When the officers approached the house, they saw a dead man in the front yard. Upon entering the house, they saw a body in the living room and a great deal of blood. The officers retrieved the children from the bedroom and stood in a line in front of the victim's body, so the children would not have to see their mother's body.

Two days later, on May 7, 2007, the court filed its order stemming from the hearing on April 20 regarding child support and visitation. This ordered modified the order of protection to state that the only contact between the parties would be to set visitation. The order set out Appellant would have visitation with J.B. two days a week. In addition, the order stated that the first child support payment should be made on May 1, 2007.

On November 5, 2007, the Putnam County Grand Jury indicted Appellant for two counts of first degree murder, two counts of felony murder, one count of especially aggravated burglary, and one count of reckless endangerment. On January 21 and 22, 2009, the trial court held a jury trial. At the conclusion of trial, the jury convicted Appellant of two counts of second degree murder, two counts of felony murder, one count of especially aggravated burglary, and one count of reckless endangerment. The jury determined that Appellant should be sentenced to life in prison for the two felony murder convictions.

The trial court held a sentencing hearing on March 30, 2009. At the conclusion of the sentencing hearing, the trial court sentenced Appellant to twenty-three years for each second degree murder conviction and ordered that they run consecutively to each other. The trial court also merged the second degree murder convictions into the felony murder convictions. The felony murder convictions were also run consecutively to each other. The trial court sentenced Appellant to eleven years for the especially aggravated burglary conviction to run concurrently with the first felony murder conviction, and sentenced Appellant to two years for the reckless endangerment conviction to run concurrently with the felony murder convictions and the especially aggravated burglary conviction. Appellant's total effective sentence was two consecutive life sentences plus 13 years.

Appellant filed a timely notice of appeal.

## ANALYSIS

### Due Process Considerations

Appellant's first argument is that the burglary statutes violate due process because the definition of "owner" found at Tennessee Code Annotated section 39-14-401(3) did not give him notice that he would be deprived of his ownership interest in his home. Appellant

proceeds to argue that the orders of protection did not spell out the consequences with regard to the burglary statute.

Appellant does not argue how the statute itself violates due process, but instead states that "without notice at the time of such order of the meaningful consequences of the order's violation, the legislature can not merely declare an owner to be a burglar of his own property." However, the burglary statutes do not set out the parameters of what should or should not be included in an order of protection. Instead, Tennessee Code Annotated section 36-3-606 sets out the scope of an order of protection. Appellant has not provided any argument as to why Tennessee Code Annotated section 39-14-401(3) standing on its own, without regard to the orders of protection, violates his due process rights. Accordingly, Appellant has not presented an argument regarding this issue as is required by the rules of this Court. Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Therefore, this issue is waived.

However, after a review of the record, we have determined that there is an issue regarding the definition of "owner" with regard to Appellant that we must address. Burglary is defined as the entry into a building without the effective consent of the owner. T.C.A. § 39-14-402(a)(1). This definition is also included in the statutes setting out both aggravated burglary and especially aggravated burglary. *See* T.C.A. § 39-14-403, -404. Tennessee Code Annotated section 39-14-401(3) states that, for purposes of burglary, an owner is:

> [A] person in lawful possession of property whether the possession is actual or constructive. "Owner" does not include a person, who is restrained from the property or habitation by a valid court order or order of protection, other than an ex parte order of protection, obtained by the person maintaining residence on the property.

The definition of "owner" as set out above, addresses the situation where an individual would be considered an owner but has been restrained from the home due to an order obtained by another resident of the home. Therefore, if an individual is the subject of an order restraining them from their own home they are not considered an owner and can be guilty of burglary. However, if the order or protection is an ex parte order, they are still considered an owner and cannot be guilty of burglary.

This is of significance in the situation at hand because of the dates of the entry of the various orders of protection entered by the trial court. The victim obtained an ex parte order of protection on February 22, 2008. As pointed out by the State, Appellant did sign the order when he was given notice of the entry of the order. The ex parte order was extended on

March 26, 2007. The second ex parte order set a hearing date for April 5, 2007. The hearing was not actually held until April 20, 2007. According to Appellant he was present at the hearing. The trial court modified the order of protection only to the extent that Appellant and the victim should have contact to set visitation. Outside of setting visitation, the order of protection was still in effect. In addition, the trial court stated that Appellant should have visitation with J.B. two days each week. The trial court also ordered the payment of temporary child support. The first payment was ordered to be paid on May 1, 2007. The order setting out this information was actually filed on May 7, 2007, two days after the murders.

This issue in this factual scenario is whether any of the orders filed by the trial court were such that Appellant would be excluded from the definition of "owner" as set out in Tennessee Code Annotated section 39-14-401(3). Generally, when construing a statute, every word within the statute is presumed to "have meaning and purpose and should be given full effect." *State v. Odom*, 928 S.W.2d 18, 29-30 (Tenn. 1996) (quoting *Marsh v. Henderson*, 424 S.W.2d 193, 196 (Tenn. 1968)). This Court's primary duty in construing a statute is "to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995); *see also State v. Davis*, 940 S.W.2d 558, 561 (Tenn. 1997). Legislative intent should be gleaned from the "natural and ordinary meaning of the language used, without a forced or subtle construction that would limit or extend the meaning of the language." *Carter v. State*, 952 S.W.2d 417, 419 (Tenn. 1997). "In seeking to determine the 'natural and ordinary meaning' of statutory language, the usual and accepted source for such information is a dictionary." *English Mountain Spring Water v. Chumley*, 196 S.W.3d 144, 148 (Tenn. Ct. App. 2005). Furthermore, this Court should construe a statute so that its component parts are consistent and reasonable, and inconsistent parts should be harmonized, where possible. *Odom*, 928 S.W.2d at 30.

As stated above, "'Owner' does not include a person, who is restrained from the property or habitation by a valid court order or order of protection, other than an ex parte order of protection, obtained by the person maintaining residence on the property." T.C.A. § 39-14-401(3). According to the evidence at trial, both the February 22 order and the March 26 order were ex parte orders of protection. Therefore, Appellant is not excluded from the definition of "owner" under the statute as a result of these orders.

However, our analysis does not stop there. The trial court entered an order on May 7, 2007, following the April 22, 2007 hearing involving both parties two days after the murders. Because both parties were represented at the hearing, the order would not be considered an ex parte order. We must determine whether the order became effective before

the date of the murder regardless of the fact that the order was filed after the date of the murder.

> Rule 58 of the Tennessee Rules of Civil Procedure states:
>
> Entry of a judgment or an order of final disposition is effective when a judgment containing one of the following is marked on the face by the clerk as filed for entry:
>
> (1) the signatures of the judge and all parties or counsel, or
>
> (2) the signatures of the judge and one party or counsel with a certificate of counsel that a copy of the proposed order has been served on all other parties or counsel, or
>
> (3) the signature of the judge and a certificate of the clerk that a copy has been served on all other parties or counsel.

In addition, with regard to the date of effectiveness, the Advisory Commission Comments that accompany Rule 58 state:

> This Rule is designed to make uniform across the State the procedure for the entry of judgment and to make certain the effective date of a judgment. Under this Rule, *unless otherwise ordered by the court*, the effective date of a judgment is the date of its filing with the clerk after being signed by the judge, even though it may not be copied or entered on the minute book until a later date.

Tenn. R. Civ. Pro. 58, Advisory Comm'n Comments (emphasis added).

Our supreme court reviewed Rule 58 in an analogous situation in *Blackburn v. Blackburn*, 270 S.W.3d 42 (Tenn. 2008). In *Blackburn*, Wife filed for divorce on February 25, 2005. *Blackburn*, 270 S.W.3d at 45. At a hearing held on June 6, 2005, the attorneys for both parties informed the court that a full agreement had been reached. *Id.* There was not a court reporter present at this hearing. Because of the stated agreement, Wife's attorney drafted a proposed judgment of divorce and sent it to Husband's attorney on June 13, 2005. Wife's attorney asked Husband's attorney to sign the judgment and send it to the trial court if Husband's attorney approved the judgment. *Id.* Husband's attorney did not sign or forward the judgment to the trial court. On October 30, 2005, Husband died in an automobile

accident, and at that point, Husband's attorney filed a motion for entry of the divorce judgment nunc pro tunc, to be effective on June 6, 2005. *Id.* at 45-46.

In its opinion, our supreme court analyzed a line of cases concerning when various divorce decrees became effective when the judgment had not actually been filed before the death of one of the parties. *See id.* at 51-54. The court concluded, "as a prerequisite to an entry *nunc pro tunc*, there generally must exist some written notation or memorandum indicating the intent of the trial court to enter the judgment on the earlier date." *Id.* at 54 (footnote omitted).

This conclusion is reiterated in the court's analysis of the Advisory Commission Comments accompanying Rule 58 in which it states that the effective date of a judgment is when it is filed, "unless otherwise ordered by the court." *See id.* at 50 n.14. Our supreme court stated, "It was and is this Court's intent that the clause 'unless otherwise ordered by the court' allows the court to select a date other than the date the judgment is filed with the clerk." *Id.*

In the case at hand, the trial court's order modifying and extending the order of protection was filed May 7, 2007. However, the trial court specifically included in its order that Appellant was to make his first payment of temporary child support on May 1, 2007. Therefore, we conclude that the effective date of the trial court's order is May 1, 2007. This date is before the date of the murders. Therefore, Appellant was restrained from the property by a valid court order as of May 1, 2007. As a result, Appellant is not considered an owner under the Tennessee Code Annotated section 39-14-401(3).

Therefore, this issue is without merit.

### Sufficiency of the Evidence

Appellant argues that the evidence was insufficient to support his conviction of reckless endangerment because the children were not in imminent danger. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d

913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

Reckless endangerment occurs when a person, "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103. Reckless is defined as:

> [A]ct[ing] recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-302(d).

"[F]or the threat of death or serious bodily injury to be 'imminent,' the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999). "[T]he term "zone of danger" may be employed to define that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area." *Id.*

As stated above, we must review the evidence in a light most favorable to the State. At trial, Appellant testified that he could see M.C. and J.B. through the window in M.C.'s room when he arrived at the front door. There was testimony that M.C.'s window was next

-9-

to the front door.  Appellant shot through the front door, right next to the M.C.'s window several times. More importantly, Appellant testified that he followed Mr. Prewitt into M.C.'s bedroom.  He saw the children in the room.  Appellant stated that Mr. Prewitt pushed the children behind him in order to protect them.  Appellant stated that he began shooting when Mr. Prewitt attempted to climb out of the window.  It is clear that Appellant began shooting at Mr. Prewitt when the children were in close proximity.  We conclude that a reasonable trier of fact could conclude that the children were within the zone of danger.  We also conclude that a reasonable trier of fact would determine that Appellant was acting with conscious disregard to the substantial risk that his shooting the gun in the bedroom placed the children in imminent danger of death or serious bodily injury.

Therefore, this issue is without merit.

### Sentencing

#### Sentence for Especially Aggravated Burglary

Appellant argues that his conviction for especially aggravated burglary should be modified to a conviction for aggravated burglary because he was also convicted of second degree murder.  The State concedes this issue.

Tennessee Code Annotated section 39-14-404 sets out the offense of especially aggravated burglary which is the burglary of a habitation where the victim suffers serious bodily injury.  The statute goes on to state, "Acts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both." T.C.A. § 39-14-404(d).  This Court has held that a conviction for both especially aggravated burglary and murder cannot stand because the killing of another is "serious bodily injury" under this statute. *See State v. Oller*, 851 S.W.2d 841, 843 (Tenn. Crim. App. 1992).  When such an event has occurred, the "proper remedy" is to modify the sentence for especially aggravated burglary to aggravated burglary as a lesser included offense.  *See State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993); *Oller*, 851 S.W.2d at 843.

Therefore, we must remand this case so that the trial court may modify Appellant's sentence for especially aggravated burglary to aggravated burglary.

#### Consecutive Sentencing

Appellant also argues that the trial court erred in ordering Appellant to serve his sentences consecutively based upon its finding that Appellant was a dangerous offender. The State argues that the trial court properly imposed consecutive sentences.

"When reviewing sentencing issues . . . , the appellate court shall conduct a *de novo* review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d). "[T]he presumption of correctness 'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If . . . the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." *Id.* at 345 (citing *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992)). We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts regarding sentences for similar offenses, (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

When imposing the sentence within the appropriate sentencing range for the defendant:

[T]he court shall consider, but is not bound by, the following *advisory* sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (emphasis added). However, the weight given by the trial court to the mitigating and enhancement factors are left to the trial court's discretion and are not a basis for reversal by an appellate court of an imposed sentence. *Carter*, 254 S.W.3d at 345. "An appellate court is . . . bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.* at 346.

A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
>
> (6) The defendant is sentenced for an offense committed while on probation; or
>
> (7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). When imposing a consecutive sentence, a trial court should also consider general sentencing principles, which include whether or not the length of a sentence is justly deserved in relation to the seriousness of the offense. *See State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). The imposition of consecutive sentencing is in the discretion of the trial court. *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

If the trial court rests its determination of consecutive sentencing on the basis of a defendant's status as a "dangerous offender," the court must make two additional findings, as required by *State v. Wilkerson*, 905 S.W.2d 905 (Tenn. 1995). *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). First, the trial court must find that an extended sentence is necessary to protect the public from further criminal conduct by the defendant, and, second, it must find consecutive sentencing to be reasonably-related to the severity of the offenses. *Wilkerson*, 905 S.W.2d at 939.

At the conclusion of the sentencing hearing, the trial court made findings with regard to consecutive sentencing. The trial court stated that Appellant loaded his pistols and that he made a call stating his intent to kill the victims prior to the incident. The trial court also stated that the nature of the crime was different than anything he had seen during his years of prosecuting and on the bench. The trial court stated, "I will characterize it as a rampage. Complete bedlam and an intentional act done by the defendant after premeditated consideration in his going in, shooting" nine shots into the victim and six shots into Mr. Prewitt. In addition, the trial court cited the fact that the children were present and there was a further possibility of the death of his own children. The trial court found this specifically relevant to its consideration as to whether Appellant was a dangerous offender. The trial court also found that the fact that Appellant sat outside the house and cut himself on the arm more evidence that Appellant was a dangerous offender. Finally, the trial court cited the fact that Appellant was under a court's order of protection. The trial court concluded that Appellant had a complete disregard of the law when he violated the order of protection.

The trial court then specifically turned to the factors set out in *Wilkerson*. The trial court specifically found that consecutive sentencing was necessary to protect the public from Appellant based upon its reasoning set out above. In addition, the trial court stated that the sentences were unquestionably reasonably-related to the offenses.

We agree with the trial court that Appellant's behavior "indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." The trial court specifically found the two additional factors under *Wilkerson*. As stated above, there is a presumption of correctness so long as the trial court follows the sentencing principles and procedures. The trial court followed the procedure and principles as set out in our statutes. Furthermore, the trial court has made the appropriate findings to

impose consecutive sentences. We find ample support for the trial court's findings that Appellant is a dangerous offender. For this reason, we conclude that the trial court properly imposed consecutive sentences.

Therefore, this issue is without merit.

## **CONCLUSION**

We remand this case for the trial court's modification of Appellant's sentence for especially aggravated burglary to aggravated burglary. In all other respects, we affirm the judgments of the trial court.


_____
JERRY L. SMITH, JUDGE